# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

_____

№ 07-CV-0141 (JFB) (SMG)
_____

KATHLEEN M. MIECZKOWSKI,

Plaintiff,

VERSUS

MICHAEL J. ASTRUE, COMMISSIONER
SOCIAL SECURITY ADMINISTRATION
Defendant.

_____

MEMORANDUM AND ORDER
March 31, 2008
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Kathleen M. Mieczkowski (hereinafter, "Mieczkowski" or "plaintiff") brings the above-captioned action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, seeking review of the Commissioner of Social Security's decision to deny her application for disability insurance benefits ("DIB"). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

For the reasons that follow, the case is remanded to the Administrative Law Judge for further proceedings in accordance with this Memorandum and Order.

I. BACKGROUND

A. Facts

1. Vocational and Other Evidence

Plaintiff was born in 1968, and was 35 years old at the time of the alleged onset of disability and 38 at the time of the Administrative Law Judge's ("ALJ") decision. (Tr. 33, 194.) She completed college. (Tr. 52, 61, 194.) She met the insured status requirements of the Social Security Act through December 31, 2006. (Tr. 36.)

At the time of the hearing on July 13, 2006, plaintiff lived with her husband and two children, who were four years old and nine months old, respectively. (Tr. 194.) Plaintiff

took care of the needs of her two children during the day, while her husband worked. (Tr. 88, 194, 207-08.) Her four year-old went to nursery school and was home by 11:30 a.m. (Tr. 207.) Her husband worked and generally arrived home around 6:00 p.m. (*Id.*) She testified that she would never cook. (Tr. 208.)

Plaintiff had worked as a project manager, administrative/office manager, market researcher, and cashier/salesperson. (Tr. 47, 56-57, 63, 72, 105-06, 195.) She last worked on March 15, 2001. (Tr. 37, 46, 195.) Plaintiff reported that she stopped working in 2001 because she was laid off due to economic reasons. (Tr. 46, 56.) She had her first child in May 2002, and the second child in September 2005. (Tr. 201.)

In a report dated April 26, 2004, plaintiff stated that she made simple meals and did some household chores. (Tr. 89, 90, 97.) At the time of the report, she primarily cared for her one child, then 23 months old. (Tr. 88.) Plaintiff handled the shopping. (Tr. 91.) She was able to drive and ride in a car. (Tr. 90.) She enjoyed visiting with family and friends. (Tr. 92.) She was unable to lift objects heavier than her 26-pound child. (*Id.*) Plaintiff said that she had problems with attention, could not stand for prolonged periods of time, climb more than one flight of stairs without resting, or walk for more than 10 minutes or one quarter-mile continuously. (Tr. 92, 93.) She claimed that stress caused her headaches and pain. (Tr. 94.) Plaintiff testified that her symptoms worsened in May 2003 and that she could not work after that time. (Tr. 196.) Her main symptom was headaches which made her unable to sleep and left her exhausted. (Tr. 197.)

2. Medical Evidence

a. Treating Physicians

On April 12, 2001, Dr. Karen Schorn, a rheumatologist, examined plaintiff for chronic pain complaints upon referral by Dr. Richard Federbush. (Tr. 114-16.) Plaintiff, then an unemployed market researcher (Tr. 115), told Dr. Schorn that she had ankle and hip joint pain for over 20 years, since age 12. (Tr. 114.) For the past week, she had been experiencing knee, lower back, shoulder and ankle pain, which was associated with low grade fevers. (*Id.*) Plaintiff was taking Elavil, Methocarbamol, Proventil, Celebrex, Benadryl, and Sudafed. (*Id.*) A rheumatologic exam revealed multiple tender points and Reynaud's of her feet. (Tr. 115.) Dr. Schorn believed that plaintiff had fibromyalgia, but further testing was planned to rule out underlying connective tissue disease. (*Id.*) Dr. Schorn stated that if her laboratory tests were normal, plaintiff should be treated as a fibromyalgia[1] patient, provided sleep medications, and prescribed exercise. (Tr. 116.)

Upon examination on May 21, 2003, Dr. Schorn recorded that plaintiff was not depressed, but was not sleeping well, complained of dry mouth, and multiple tender points were present. (Tr. 118.) She prescribed Pamelor. (*Id.*) Upon examination on October 21, 2003, Dr. Schorn noted that plaintiff recently had a baby. (Tr. 119.) Plaintiff complained of generalized body aches, joint pain, fatigue, and a red rash on her face. (Tr. 119.) Dr. Schorn found that

---

[1] Fibromyalgia consists of pain and stiffness in the muscles and joints that is either diffuse or has multiple trigger points. *Dorlands's Illustrated Medical Dictionary* 697 (30th ed. 2003)

2

plaintiff's joints were hyper-flexible and that she had multiple tender points, but there were no signs of active inflammation in her joints. (Tr. 119.) Plaintiff next saw Dr. Schorn on February 11, 2004. Dr. Schorn noted multiple tender points and prescribed Effexor. (Tr. 117, duplicated at Tr. 190.) During a visit on March 2, 2004 (Tr. 120), Dr. Schorn stated that plaintiff's condition was essentially unchanged since October 2003. (*Id.*)

Dr. Richard Federbush completed a report on April 8, 2004. (Tr. 122-28, duplicated at 165-71.) He had treated plaintiff since 1998 and last examined her in December 2003. (Tr. 122.) Plaintiff complained of recurrent headaches, fatigue, joint and muscle pain, and muscle weakness. (*Id.*) Dr. Federbush diagnosed plaintiff with fibromyalgia and headaches. (*Id.*) He opined that plaintiff had not displayed any behavior consistent with a significant mental disorder. (Tr. 123.) Clinical findings consisted of multiple tender trigger points. (Tr. 123.) All serological tests had been negative. (Tr. 124.) Plaintiff had no significant gait abnormality and did not need any assistive devices. (Tr. 124-25.) Dr. Federbush assessed that plaintiff was able to lift and carry up to five pounds occasionally, stand and walk up to two hours, and sit less than six hours in a workday. (Tr. 127.) She was not limited in her ability to push and pull and had no other limitations. (Tr. 128.) Dr. Federbush did not indicate any restrictions to joint ranges of motion. (Tr. 129-30.)

Plaintiff saw Dr. Schorn on August 12, 2004. (Tr. 189.) Plaintiff complained of muscle tenderness, neck and shoulder pain, and some left hand numbness. (*Id.*) She had discontinued the Effexor because it had a bad taste. (*Id.*) Dr. Schorn suspected that plaintiff was menopausal. (*Id.*)

On January 29, 2005, Dr. Federbush signed an affirmation prepared by plaintiff's attorney stating that plaintiff's condition was unchanged and she was unable to return to any gainful employment at that time. (Tr. 164.)

On February 7, 2005, plaintiff saw Dr. Schorn and stated that she recently had fallen down stairs, and that she was five weeks pregnant and had discontinued all medications except multivitamins. (Tr. 188.) Plaintiff was willing to try physical therapy. (*Id.*) The only other information for that visit is that Dr. Schorn noted that plaintiff was "here to help me complete disability questionnaire." (*Id.*) That same day, Dr. Schorn completed a fibromyalgia residual functional capacity questionnaire. (Tr. 172-75.) Dr. Schorn stated that she had seen plaintiff two to three times annually since April 2001. (Tr. 172.) Her only diagnosis was fibromyalgia. (*Id.*) Dr. Schorn stated that plaintiff was capable of handling low stress jobs, could lift/carry less than 10 pounds, and could sit, stand, and/or walk less than two hours in a workday, and would be absent from work due to symptoms more than four days monthly. (Tr. 173-75.)

Plaintiff next saw Dr. Schorn one year later, on February 1, 2006. Plaintiff said that she was not on any medications ("med 0"). (Tr. 188.) She had given birth four months earlier. (*Id.*) She complained of daily headaches, joint pain, night sweats, hair loss, and difficulty losing weight. (*Id.*) Dr. Schorn noted that plaintiff had a receding hairline (*id.*), and multiple tender points, but no rash (Tr. 187-88). She ordered laboratory tests, prescribed Mobic, and recommended therapy and anti-depressants. (Tr. 187.)

On February 23, 2006, plaintiff saw Dr. Schorn and complained of headaches. (Tr.

3

187). Dr. Schorn noted that an MRI of the brain was done two years earlier, and had been negative. (*Id.*) She adjusted the Effexor dosage. (*Id.*) Plaintiff returned to Dr. Schorn on June 21, 2006. (Tr. 186.) Tenderpoints were present. Plaintiff stated that she had headaches and planned to see a neurologist. (*Id.*) That same day, Dr. Schorn signed an affirmation prepared by plaintiff's attorney stating that plaintiffs condition was unchanged since February 7, 2005. (Tr. 185.) The doctor reported that she had not treated plaintiff from February 2005 to February 2006 because plaintiff had been pregnant and gave birth. Dr. Schorn asserted that plaintiff was unable to return to any gainful employment at that time. (*Id.*)

b. Consulting Physicians

On May 13, 2004, Dr. Samir Dutta conducted a consultative examination of plaintiff. (Tr. 131-33.) Plaintiff told Dr. Dutta that she performed household chores, such as cooking, laundry, cleaning, and shopping. (Tr. 132.) She was responsible for the care of her young child. (*Id.*) Plaintiff took care of her personal needs and was able to shower, bathe, and dress herself. (*Id.*) She watched television, listened to the radio, and read. (*Id.*) She was able to go to the park and stores occasionally. (*Id.*) She socialized with friends. (*Id.*) Plaintiff said that she had been somewhat depressed for the last three years, but was not being seen by a psychiatrist. (Tr. 131.)

Upon examination, Dr. Dutta found that plaintiff was in no acute distress. (Tr. 132.) Plaintiff exhibited a normal gait and station with no use of any assistive devices. (Tr. 131--32.) She had no difficulty in toe and heel walking. She was able to fully squat. Plaintiff needed no assistance to get on and off the examination table, and was able to rise from a seated position in a chair without any problem. She retained normal fine motor activity. (Tr. 132.) Examination of her lumbar, thoracic, and cervical spines was normal. (Tr. 132-33.) Dr. Dutta did not find any spinal trigger points. (*Id.*) Plaintiff's upper extremities retained full ranges of motion with no instability, effusion, or inflammation. (Tr. 132.) Her lower extremities retained good to full ranges of motion in all joints with no swelling, instability, or effusion. (Tr. 133.) Hip flexion was to 90°, interior rotation was to 35°, external rotation was to 40°, and backward extension was to 25° bilaterally. (*Id.*) Knee flexion was to 130° bilaterally. (*Id.*)[2] Her strength was full (5/5) throughout and there was no atrophy. (Tr. 132-33.) Sensory examination was normal. (*Id.*) Reflexes were normal. (*Id.*)

Dr. Dutta diagnosed a history of fibromyalgia, asthma, allergy and depression. (Tr. 133.) Dr. Dutta opined that plaintiff was mildly limited in her ability to stand, walk and continuously carry weights. (*Id.*) He assessed that plaintiff had no limitations in her ability to sit. (*Id.*)

That same day, May 14, 2004, plaintiff was evaluated by Dr. Judith Shaw, a psychologist. (Tr. 134-38.) Plaintiff said that she had been unemployed since being laid off in 2001 from her last job as a "project manager," a job she held for two years. (Tr.

---

[2] Average hip ranges of motion are: extension to 300; flexion to 100°; abduction to 40°; adduction to 20°; external rotation to 50°; and internal rotation to 40°. American Medical Association, *Guides to the Evaluation of Permanent Impairment*, 598 (5th ed. 2001) ("Guides"). Avenge knee flexion is to 150°. *Guides* at 598.

4

134.) She stated that she had been unable to work since May 2003 due to daily headaches, and that she currently had headaches only twice weekly. (Tr. 134, 138.) Plaintiff had no psychiatric hospitalizations and had never been treated by a mental health professional. (Tr. 134.) She said that she could bathe, groom and dress herself. (Tr. 136.) Plaintiff could cook, as long as it was quick, and could handle household chores, such as cleaning and some laundry, but she could not vacuum or carry laundry. (*Id.*) She was limited in her shopping because she would be accompanied by her two year old child. Plaintiff could drive and could manage money. She sometimes dined out, went to the playground with her child and also socialized with friends several times monthly. (*Id.*) Plaintiff spent most of her time caring for her child. (Tr. 137.) Her hobbies were reading, cross-stitching, and crossword puzzles. (Tr. 136-37.)

Upon mental status examination, Dr. Shaw found plaintiff to be friendly and cooperative. (Tr. 135.) Her gait, posture, and motor behavior were normal. (*Id.*) Her mood was adequate and she exhibited good social skills. (Tr. 136.) Plaintiff presented with a normal appearance and had clear, fluent speech. (*Id.*) Her thought processes were normal, her affect was full range and appropriate, and her mood was euthymic. (Tr. 135-36.) Plaintiff was fully oriented, her attention and concentration were intact, her sensorium was clear, and her memory was normal. (Tr. 136.) Dr. Shaw assessed her cognitive functioning and insight as good. (*Id.*) Plaintiff was of at least average intelligence and her general fund of information was appropriate to someone of her experience. (*Id.*)

Dr. Shaw opined that plaintiff was able to follow and understand simple directions and instructions; perform simple and complex tasks independently; learn new tasks; maintain attention and concentration for, at least, short periods of time; maintain a regular schedule; make appropriate decisions; and relate adequately with others. (Tr. 137.) She might, at times, have difficulty dealing with stress. (*Id.*) Dr. Shaw stated that plaintiff's primary difficulties appeared to be caused by her medical and physical problems, particularly fibromyalgia which, plaintiff claimed, caused her pain and discomfort which somewhat limited her functioning. (*Id.*) Dr. Shaw found plaintiffs allegations to be at least partially consistent. (*Id.*) Dr. Shaw diagnosed depressive disorder, not otherwise specified ("NOS"), possibly secondary to fibromyalgia. (*Id.*)

On June 7, 2004, Dr. W. Skranovski, a psychiatrist with the State Agency, reviewed the record and opined that plaintiff was not disabled and did not meet the Listing of Impairments. (Tr. 143, 146, 153, 154.) He noted that Dr. Shaw's report revealed that plaintiff's memory and concentration were intact and her social skills were not affected. (Tr. 141.) Further, plaintiff's self-report of her activities showed that she did not need reminders, was able to travel alone, manage finances, socialize, and follow instructions. (*Id.*) Dr. Skranovski assessed that plaintiff's allegations of memory and concentration problems were not supported by the record. (*Id.*) He opined that plaintiff was able to memorize, carry out tasks, interact socially in a work setting, and adapt to changes. (*Id.*)

Dr. Skranovski's diagnosis was affective disorder, NOS. (Tr. 143, 146.) The doctor assessed that plaintiff had no limitations in the activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace, and had no history of

deterioration. (Tr. 153.) Dr. Skranovski opined that plaintiff had no significant limitation in any of the 20 categories of mental functioning. (Tr. 139-40.) Specifically, Dr. Skranovski opined that plaintiff had no significant limitation in any of the three categories in the areas of understanding and memory (Tr. 139); had no significant limitation in any of the eight categories in the area of sustained concentration and presistence (*id.*); no significant limitation in any of the five categories in the area of social interaction (Tr. 140); and no significant limitation in any of the four categories in the area of adaptation (*id.*).

Dr. U. Weber, a physician with the State Agency, reviewed the record on July 30, 2004. (Tr. 163.) The doctor noted that headaches ("HA") did not figure prominently in the clinical records and were not subject to aggressive treatment. (*Id.*) Dr. Weber concluded that plaintiff retained the functional capacity to stand and/or walk ("s/w") for two hours in a workday and could lift and carry up to 10 pounds. (*Id.*)

B. PROCEDURAL HISTORY

Plaintiff applied for disability insurance benefits on January 14, 2004, alleging disability due to pain, fatigue, memory difficulties, concentration problems, headaches, depression, and anxiety since May 2, 2003. (Tr. 33-35, 46.) Her application was denied on August 3, 2004. (Tr. 23, 24-28.) She timely requested a hearing before an ALJ. (Tr. 29-30.) Plaintiff and her representative appeared before ALJ Michael S. London for a hearing on July 13, 2006. (Tr. 191-218.) On September 21, 2006, ALJ London found plaintiff to be not disabled. (Tr. 8-16.) The Appeals Council denied review on November 30, 2006. (Tr. 2-4.) On January 11, 2007, plaintiff filed this action. On October 10, 2007, defendant answered the complaint and moved for a judgment on the pleadings. On November 8, 2007, plaintiff filed her oppposition and cross-moved for a judgment on the pleadings and a default judgment.

II. DISCUSSION

A. Default Motion

Plaintiff seeks a default judgment pursuant to Fed. R. Civ. P. 55 because while defendant timely filed the administrative transcript on May 10, 2007, defendant failed to file a formal answer until October 10, 2007. For the reasons set forth below, the motion is denied.

Federal Rule of Civil Procedure 55 sets forth the procedural steps for obtaining and vacating an entry of a default judgment. Rule 55(a) provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules . . . the clerk shall enter the party's default." Following entry of default upon the plaintiff's request, a defendant may seek to set aside the entry of default pursuant to Rule 55(c). *See, e.g., Meehan v. Snow*, 652 F.2d 274, 276 n.5 (2d Cir. 1981) ("Entering a default pursuant to Rule 55(a) and affording a defendant an opportunity to move to vacate it pursuant to Rule 55(c) is the preferable course."). If a Rule 55(c) motion is not made or is unsuccessful, and if no hearing is necessary to determine damages, a default judgment may be entered by the court or by the clerk. *Id.* at 276. Where, as here, entry of default has not yet been filed and defendant opposes the plaintiff's motion for default judgment, a district court must still apply the Rule 55(c) standard for setting aside the entry of a

default. *Id.* at 276. Under Rule 55(c), the court may set aside an entry of default "[f]or good cause shown." Fed. R. Civ. P. 55(c). Thus, although no formal entry of default has been made in this case, the same standard will be applied here and good cause "should be construed generously." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993) (citations omitted).

The factors to be considered in deciding whether to relieve a party of a default under Rule 55(c) are (1) "'whether the default was willful,'" (2) "'whether setting it aside would prejudice the adversary,'" and (3) "'whether a meritorious defense is presented.'" *Comm. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 243 (2d Cir. 1994) (quoting *Meehan*, 652 F.2d at 276). The Court is also permitted to consider relevant equitable factors, including whether failure to appear "was 'a mistake made in good-faith and whether the entry of default would bring about a harsh or unfair result.'" *Brown v. Gabbidon*, No. 06-CV-8148 (HB), 2007 U.S. Dist. LEXIS 35134, at *8 (S.D.N.Y. May 15, 2007) (quoting *Enron Oil Corp.*, 10 F.3d at 96). "Default judgments 'are generally disfavored and are reserved for rare occasions.'" *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 168 (2d Cir. 2004) (quoting *Enron Oil Corp.*, 10 F.3d at 96 ("[W]hen doubt exists as to whether a default should be granted or vacated, the doubt should be resolved in favor of the defaulting party.")). "The dispositions of motions for entries of defaults and default judgments and relief from the same under Rule 55(c) are left to the sound discretion of a district court because it is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties." *Enron Oil Corp.*, 10 F.3d at 95 (citing *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 507 (2d Cir. 1991); *Traguth v. Zuck*, 710 F.2d 90, 94 (2d Cir. 1983)).

As set forth below, after carefully analyzing the circumstances of this case under the above-referenced standard, the Court concludes that a default judgment is unwarranted. The Court will analyze the relevant factors in turn.

With respect to the first factor, though SSA failed to timely answer or otherwise respond to the complaint, SSA has demonstrated that the failure was not willful or otherwise in bad faith. SSA timely filed the administrative transcript. SSA subsequently filed three motions for extension of time to file a brief in support of defendant's motion for judgment on the pleadings. The Court granted SSA's motions for extension of time in all three instances. Further, on October 10, 2007, SSA filed an answer after discovering it had inadvertently failed to do so. Thus, SSA's actions do not demonstrate a willful effort to avoid its obligations. *See, e.g., Enron Oil Corp.,* 10 F.3d at 98 (holding that it was an abuse of discretion to deny defendant's motion to set aside an entry of default, noting that defendant had initially timely filed a motion to dismiss and had made good faith efforts to protect his rights).

With respect to the second factor, the Court concludes that plaintiff has not demonstrated prejudice. The Court evaluates any prejudice the plaintiff suffered as a result of SSA's failure to timely answer or otherwise respond. Plaintiff did not file the initial motion for default judgment until November 8, 2007, after having been served with SSA's motion for judgment on the pleadings. This excessive delay before seeking relief indicates that plaintiff is not prejudiced by any delay due to the defendant's failure to file an

answer. *Enron*, 10 F.3d at 98. ("The fact that plaintiff waited over a year before seeking such relief strongly suggests that some further delay will not unduly prejudice it."). In fact, even if the answer were timely filed, the briefing on the cross-motions to dismiss would have proceeded in exactly the same fashion with respect to timing. In short, the Court finds that absolutely no prejudice has ensued from the unintentional delay in responding to plaintiff's complaint.

Finally, with respect to the third factor, which examines whether SSA has a meritorious defense, "should be construed generously." *Id.* at 96. "'[T]he defense need not be ultimately persuasive at this stage.' A defendant 'must merely make a sufficient showing to justify further briefing and consideration by the district judge.'" *Candelaria v. Erickson*, No. 01 Civ. 8594 (LTS)(RLE), 2005 U.S. Dist. LEXIS 12840, at *35 (S.D.N.Y. June 27, 2005) (quoting *Gravatt v. City of New York*, No. 97-CV-0354 (RWS), 1997 WL 419955, at *4 (S.D.N.Y. July 28, 1997)). Although the Court is remanding the case (for the reasons set forth *infra*) for clarification by the ALJ as it relates to the treating physician rule, the remand does not suggest that the SSA will be unable to ultimately prevail in this action with respect to plaintiff's claim. Thus, at least at this juncture, the SSA has put forth meritorious defenses to plaintiff's Rule 12(c) motion and there is no basis to conclude that the SSA will necessarily be unsuccessful in this action if there is an appeal following any remand. Accordingly, the third factor also weighs in SSA's favor.

In sum, because each of the above factors weighs in favor of SSA, plaintiff's motion for default judgment is denied. The Court will now turn to the merits of the cross-motions for judgment on the pleadings.

B. Applicable Legal Standards

1. Standard of Review

A district court may only set aside a determination by an ALJ which is based upon legal error or not supported by substantial evidence. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir. 1997) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (internal quotations and citations omitted). Furthermore, "it is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey*, 145 F.3d at 111; *see also Jones*, 949 F.2d at 59 (quoting *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

## 2. The Disability Determination

A claimant is entitled to disability benefits under the Act if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with regard to the first four steps; the Commissioner bears the burden of proving the last step. *Brown*, 174 F.3d at 62.

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "(1) objective medical facts and clinical findings; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability; and (4) claimant's educational background, age, and work experience." *Id.* (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

## C. Analysis of the Cross-Motions

In opposing defendant's motion and cross-moving, plaintiff argues that the ALJ's decision is not supported by substantial evidence and is the result of legal error. Specifically, plaintiff argues that the ALJ failed to apply the Commissioner's regulations and rulings with regard to evaluating the medical opinion evidence, developing the record, and assessing the plaintiff's credibility. With regard to his allegation of the ALJ's failure to apply the Commissioner's regulations in reviewing the medical opinion evidence, plaintiff contends that the ALJ mischaracterized the treating physicians' opinion evidence and that the

9

treating physicians' opinion should have been given controlling, weight. As set forth below, the Court concludes that the ALJ failed to give sufficient reasons for not giving controlling weight to the opinion of the one of the treating physicians, Dr. Federbush, and that the case must be remanded for such a determination.

### (1) The Five-Step Procedure

The ALJ applied the five-step procedure. The ALJ found that plaintiff had not engaged in substantial gainful activity since her application date of February 28, 2002. (Tr. 15.) The ALJ found, at the second and third step of the sequential analysis, that plaintiff had severe impairments, specifically fibromyalgia and depressive disorder, but that these severe impairments did not meet or equal any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*.)

Prior to proceeding to step four, the ALJ found that plaintiff was limited to a reduced range of sedentary work in that she could lift/carry 10 pounds occasionally and five pounds frequently; could sit for six hours and stand and/or walk for two hours, retained the mental capabilities to perform unskilled to complex tasks, but should avoid stressful, highly competitive jobs. (Tr. at 15.) At the fourth step, the ALJ found that plaintiff was unable to perform any of her past relevant work. (*Id.*)

At step five, using the Medical-Vocational Guidelines as a framework, the ALJ found that there were a substantial number of jobs available in the national economy which plaintiff could perform. The ALJ determined that, based upon, among other things, plaintiff's residual functional capacity and the opinion of Doctor Dutta, plaintiff could perform sedentary work. (*Id*. at 15.) Pursuant to 20 C.F.R. § 416.967(a),

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.

Thus, the ALJ concluded that plaintiff was not disabled. (*Id*. at 21.)

### (2) The Treating Physician Rule

The ALJ acknowledged that plaintiff's treating physicians, Dr. Federbush and Dr. Schorn, had provided opinions that were not compatible with the requirements for sedentary work, but the ALJ did not give these assessments controlling weight. As discussed below, the ALJ failed to give sufficient reasons for refusing to give controlling weight to Dr. Federbush and, thus, a remand is warranted.

The Commissioner must accord special evidentiary weight to the opinion of the treating physician. *See Clark,* 143 F.3d at 119. The "treating physician rule," as it is known, "mandates that the medical opinion of the claimant's treating physician [be] given controlling weight if it is well supported by the medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *Clark*, 143 F.3d at 119; *Schisler v. Sullivan*, 3 F.3d 563, 567 (3d Cir. 1993). The rule, as set forth in the regulations, provides:

Generally, we give more weight to opinions by your treating sources . . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the Commissioner must apply various factors to decide how much weight to give the opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118. These factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Clark*, 143 F.3d at 118. When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must "give good reasons in his notice of determination or decision for the weight [he] gives [the claimant's] treating source's opinion." *Clark*, 143 F.3d at 118 (quoting C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). This proclivity toward the treating physician's opinion is based on the fact that treating physicians are "most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." 20 C.F.R. § 404.1527(d)(2); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

With respect to treating physician Dr. Federbush, the sole reason provided by the ALJ for not giving his opinion controlling weight was that the report contained inconsistencies regarding the plaintiff's functional ability:

Regarding the claimant's functional ability his report contains inconsistencies. He states the claimant can stand and walk two hours in an eight hour work day and in another section of the report states the claimant has problems with standing and walking though not sitting. Dr. Federbush said the claimant has no significant gait abnormality and required no assistive devices. In a physical functional assessment of the claimant, Dr. Federbush said the claimant could lift and carry five pounds, stand and walk two hours in an eight hour work day, sit six hours in an eight hour work day, has no limitation in pushing and pulling and no other limitation.

(Tr. 13-14.). As a threshold matter, there is an error in the ALJ's recitation of the facts. Specifically, although the ALJ states that Dr. Federbush found that plaintiff could sit six hours in an eight hour day, that is incorrect. In Dr. Federbush's report, dated April 8, 2004, he did not check off the box indicating she could sit "up to 6 hour per day"; rather, he checked off the box stating she can sit "less than 6 hours per day." (Tr. 127.) Moreover, the inconsistency pointed to by the ALJ is far from compelling. The ALJ stated that Dr. Federbush's report is inconsistent because in one portion of the Report it stated that

11

plaintiff could stand and walk two hours per day and, in another portion, it stated that plaintiff was reporting having difficulty walking (namely, "hard to walk"). It is unclear to the Court as to why these two statements are necessarily inconsistent, without further analysis. In other words, someone who has problems walking may still be able to engage in some walking, such as two hours out of an eight-hour day. Therefore, the ALJ's decision contained both factual errors and incomplete reasoning as to why the opinion should not be given controlling weight. Moreover, the ALJ failed to analyze the other factors which must be considered under the applicable regulations pertaining to the treating physician, including: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist.

Defendant points to other evidence in the record that could have supported the ALJ's determination that Dr. Federbush's opinion should not be given controlling weight. First, the defendant notes that "[t]he only information concerning Dr. Federbush's treatment of plaintiff are his April 8, 2004 report (Tr. 122-28) and a January 29, 2005 affirmation prepared by plaintiff's attorney in support of her application for Social Security benefits (Tr. 165)." (Defendant's Brief, at 17.) Second, defendant points out that "Dr. Federbush's assessment of plaintiff's limitations in both records was unsupported by any clinical, laboratory or diagnostic techniques, but simply consisted of check-off-the-box responses without any elaboration." (*Id.*) In addition, defendant contends that "Dr. Federbush's assessment is inconsistent with other medical evidence of record" and defendant includes the following example:

> While Dr. Federbush indicated in this April 8, 2004 report that plaintiff could lift and carry five pounds, six days later, plaintff herself, in an April 14, 2004 questionnaire, contradicted this assessment and stated "I cannot lift heavy objects (heavier than my daughter – 26 lbs.) without pain" (Tr. 92).

(Defendant's Brief, at 17.) However, none of these points were made by the ALJ; rather, the defendant is assuming that these were the factors that the ALJ had in mind in refusing to give Dr. Federbush's opinion controlling weight.[3] The Court declines to make such an assumption or speculate as to what unarticulated reasons the ALJ may have had for rejecting Dr. Federbush's opinion. As the Second Circuit has stated:

> We do not hesitate to remand when the Commissioner has not provided

---

[3] In support of the ALJ's overall decision regarding the lack of a disability that would prevent a broad range of sedentary work, the defendant also cites to Dr. Weber, the State Agency physician who reviewed the medical records, and concluded that plaintiff's fibromyalgia was not disabling. (Tr. 163.) Dr. Weber opined that plaintiff retained the functional capacity to stand and/or walk for two hours in a workday and could lift and carry up to ten pounds. (Tr. 163.) Dr. Weber further noted that plaintiff reported that headaches were her primary problem, yet the records had no indication that treatment was being provided for the headaches. (Tr.163, 197.) However, the ALJ never referenced Dr. Weber or his conclusions in his decision. Therefore, it is unclear whether Dr. Weber's opinion had any role in the ALJ's decision to reject Dr. Federbush's opinion.

"good reasons" for the weight given to a treating physicians opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

Finally, defendant argues that the ALJ did not need to give the opinions of the treating physician controlling weight because of "the lack of any objective evidence corroborating plaintiff's alleged limitations from her treating physicians provide substantial support for the ALJ's decision that plaintiff's fibromyalgia was not disabling." (Defendant's Brief, at 18.) However, "objective" evidence beyond clinical findings are not necessary to establish that plaintiff suffered from fibromyalgia. *See Green-Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir. 2003) ("We conclude from the record before us that the ALJ erred by failing to give controlling weight to the treating physician's opinion and effectively requiring objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia under established medical guidelines."). Specifically, the Second Circuit has noted that "a growing number of courts, including our own, . . .have recognized that fibromyalgia is a disabling impairment and that there are no objective tests which can conclusively confirm the disease." *Id.* at 108 (citations and quotations omitted) (collecting cases); *see also Davidow v. Astrue,* No. 06-CV-6253 CJS, 2007 WL 1428430, at *5 (W.D.N.Y. Mar. 2, 2007) ("Since the ALJ rejected Dr. Kane's RFC assessment, it appears to the Court that the ALJ also discredited plaintiff's testimony because it, too, is unsubstantiated by objective medical evidence. . . . In light of the unique nature subjective complaints of pain play in the case of an individual diagnosed with fibromyalgia, the ALJ's decision to discount plaintiff's complaints is not supported by substantial evidence in the Record."). Thus, even if the lack of objective medical evidence had been stated by the ALJ as a reason for rejecting Dr. Federbush's opinion (which it was not), the lack of such evidence would not be conclusive in demonstrating that Dr. Federbush's opinion should not be followed.

In sum, the ALJ's decision is deficient in several respects with respect to the treating physician rule as it relates to Dr. Federbush, including that the reasons given by the ALJ contained factual inaccuracies, that the ALJ failed to examine the full list of factors outlined under the law and thus failed to properly apply the legal standard applicable to a treating physician's opinion, and the decision contained incomplete reasoning for the ALJ's decision. Thus, the Court will remand the case.[4] *See, e.g.*, *Risitano v. Comm'r of Soc. Sec.*, 2007 U.S. Dist. LEXIS 58276, at * 10 (E.D.N.Y. Aug. 9, 2007) (remanding case and directing th ALJ to "identify the evidence [the ALJ] did decide to rely on and thoroughly explain . . . the reasons for his decision" if the ALJ did not intend to

---

[4] Plaintiff also contends that the ALJ's analysis for the other treating doctor (Dr. Schorn) is similarly deficient. However, the ALJ's articulated reasons for rejecting Dr. Schorn's opinion were more detailed than those for Dr. Federbush and provided a clear basis for rejecting her opinion. Thus, plaintiff's contentions with respect to alleged flaws in the reasons given for rejecting Dr. Schorn's opinion are unpersuasive. However, when re-considering the opinion of Dr. Federbush on remand, the ALJ should consider whether that re-assessment alters his conclusion regarding Dr. Schorn's opinion.

rely on the opinions of plaintiff's treating physicians); *Torregrosa v. Barnhart*, No. CV-03-5275, 2004 U.S. Dist. LEXIS 16988 (FB), at *18 (E.D.N.Y. Aug. 27, 2004) (remanding because "(1) there is a reasonable basis to doubt whether the ALJ applied the correct legal standard in weighing the opinions of [the treating physicians], and (2) the ALJ failed to give good reasons for the weight, or lack thereof, given to those opinions "). Accordingly, upon remand, the ALJ must clarify his reasons for declining to afford controlling weight to plaintiff's treating physicians.[5]

## IV. CONCLUSION

For the reasons stated above, defendant's motion is DENIED and plaintiff's motion is GRANTED to the extent it seeks a remand for further proceedings. Accordingly, this case is REMANDED for further proceedings consistent with this Memorandum and Order. In addition, plaintiff's motion for entry of a

---

[5] Plaintiff also contends that the ALJ failed to properly assess plaintiff's credibility. "[W]here a claimant's subjective testimony is rejected, the ALJ must do so explicitly and specifically." *Kleiman v. Barnhart*, No. 03-CV-6035 (GWG), 2005 U.S. Dist. LEXIS 5826, at * 32 (S.D.N.Y. Apr. 8, 2005) (citing *Williams v. Bowen*, 859 F.2d 255, 261 (2d Cir. 1988) (holding that where an ALJ rejects witness testimony as not credible, it must set forth the basis for this finding "with sufficient specificity to permit intelligible plenary review of the record")). The ALJ concluded that, although plaintiff testified regarding headaches, she could still perform a wide range of sedentary work. Based on the record as a whole, the ALJ did not accept plaintiff's subjective complaints because of their inconsistency with the medical evidence, and plaintiff's own testimony and statements to doctors. (*See* Tr. 15.) The ALJ has an absolute duty and obligation to consider not only the plaintiff's testimony, but the record as a whole. *See Yancey*, 145 F.3d at 111; *Jones*, 949 F.2d at 59; *Kendall v. Apfel*, 15 F. Supp. 2d 262, 267 (E.D.N.Y. 1998); *Rosado v. Shalala*, 868 F. Supp. 471, 473 (E.D.N.Y. 1994). Indeed, "[i]t is the function of the Secretary, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal citations and quotations omitted). Here, although plaintiff complained of headaches and related ailments, the ALJ still found she could perform sedentary work based primarily on plaintiff's own testimony (and statements to Dr. Dutta) regarding her daily activities, including taking care of two young children from the morning until her husband comes home from work, as well as cooking, cleaning, laundry, shopping, showering herself, bathing herself, dressing herself, watching television, listening to the radio, reading, going to the park and stores once in while and socializing with friends (Tr. 14). *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *Rosario v. Sullivan*, 875 F. Supp. 142, 146 (E.D.N.Y. 1995). The ALJ also noted that "the claimant states her main problem is headaches which have gotten better and she now has them only twice a week." (Tr. 14.) Thus, to the extent plaintiff claimed to be disabled by headaches, the ALJ found her testimony to be not credible. (Tr. 15.) Although plaintiff contested certain statements that were attributed to her by Dr. Dutta, the ALJ is in a better position than this Court to evaluate a claimant's credibility and the ALJ explicitly and specifically articulated the reasons for rejecting plaintiff's testimony. *See Youney v. Barnhart*, 280 F. Supp. 2d 52, 61 (W.D.N.Y. 2003) (citing *Crowley v. Barnhart*, 220 F. Supp. 2d 176, 181 (W.D.N.Y. 2002) (citation omitted)). Accordingly, the Court rejects plaintiff's claim that remand is warranted due to the ALJ's failure to properly assess plaintiff's credibility. However, to the extent that the ALJ, on remand, reevaluates the evidence in addressing the "treating physician" rule, the ALJ should also consider whether that re-evaluation alters his assessment of plaintiff's credibility in light of the evidence as a whole.

default judgment pursuant Fed. R. Civ. P. 55 is DENIED.

       SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 31, 2008
Central Islip, New York

       \* \* \*

The attorney for plaintiff is Aba Heiman, Esq. of Fusco, Brandenstein & Rada, PC, 180 Froehlich Farm Boulevard, Woodbury, NY 11797. The attorney for defendant is Vincent Lipari, Esq., Assistant United States Attorney, Eastern District of New York, 610 Federal Plaza, 5th Floor, Central Islip, New York, 11722-4454.